UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------

In re:                                                                                          Case No. 07-13408
     RUDOLPH P. PRISCO,                                              Chapter 7

                            Debtor.
---------------------------------------------------------------

APPEARANCES:

RUDOLPH P. PRISCO, *Pro Se*
*Debtor*
19 Manchester Dr.
Clifton Park, NY 12065

HOGAN LOVELLS US LLP                           Nichole E. Schiavo, Esq.
*Attorneys for Wells Fargo Bank, N.A. as servicer*
*for U.S. Bank as Trustee for MASTR Asset-Backed*
*Securities Trust 2005-AB1 Assignee of Wells Fargo*
*Bank, N.A.*
875 Third Avenue
New York, NY 10022

Robert E. Littlefield, Jr., United States Bankruptcy Judge

## MEMORANDUM-DECISION AND ORDER

The matter before the Court is the Amended Motion for Contempt of the Discharge Injunction filed by Rudolph P. Prisco (the "Debtor") against Wells Fargo Bank, N.A. as servicer for US Bank, N.A. as Trustee for MASTR Asset-Backed Securities Trust 2005-ABI (the "Trust").

## JURISDICTION

The Court has jurisdiction over this core matter pursuant to 28 U.S.C. § 157(a), (b)(1), (b)(2)(A).

## PROCEDURAL HISTORY

On December 12, 2007, the Debtor filed a chapter 13 bankruptcy case. (ECF No. 1.) This case was converted to chapter 7 on February 23, 2011. (ECF No. 172.) On June 5, 2008, the Court

1

entered an order that permitted the parties to enter into a loan modification agreement and conditionally lifted the stay as to the property if the Debtor defaulted on the agreement. (ECF No. 62.) The Debtor thereafter failed to make payments from November 2008 through September 2011. (ECF No. 200.) The Court granted the Trust's ex parte application to lift the stay as to its interest in the property on October 25, 2011. (ECF No. 201.) On November 15, 2011, the Debtor received his discharge. (ECF No. 208.) After substantial litigation, including multiple appeals, throughout which the Debtor represented himself, the case was closed on March 3, 2015. (ECF No. 277.) Nearly a year later, on February 24, 2016, the Debtor filed a Motion to Reopen his case for, among other purposes, pursuing the Trust for violations of the discharge injunction. (ECF No. 282.) The parties agreed to enter into mediation and hold the Motion to Reopen in abeyance. Ultimately, mediation failed, and the Debtor's motion was granted for the limited purpose of allowing him to "pursue violations of the discharge injunction against the Trust and/or Wells Fargo, as servicer." (ECF No. 329.)

The Debtor's initial Motion for Contempt of the Discharge Injunction (the "Motion," ECF No. 331) was beyond the scope of the Court's Order Reopening. However, given the Debtor's *pro se* status, the Court offered the Debtor the opportunity to amend the Motion. On January 24, 2017, the Debtor filed the Amended Motion for Contempt of the Discharge Injunction (the "Amended Motion," ECF No. 347). On February 24, 2017, the Trust filed opposition. (ECF Nos. 349, 350.) On March 7, 2017, the Debtor filed a reply. (ECF No. 355.) The Amended Motion was taken under advisement on March 22, 2017.

**FACTS**

In 2005, the Debtor obtained a mortgage loan in the amount of $205,000.00 from the Trust, secured by a lien on the Debtor's residence, 19 Manchester Drive, Clifton Park, NY 12065 (the

2

"Property"). The Debtor has continued to reside at the Property since he filed for bankruptcy in 2007. During the course of the Debtor's chapter 13 case, the mortgage was modified; however, the parties agree that the Debtor's personal liability under the promissory note, as modified, was discharged.

After the Debtor received his discharge on November 15, 2011, he received numerous written communications from the Trust. It appears that the Debtor first began receiving written communications as early as December 2011 – approximately one month after the Debtor received his discharge – and continued receiving documents for years. The most recent correspondence is dated November 9, 2016. All total, it appears that the Debtor received forty monthly statements, one escrow account notice, seven forced-placed insurance communications, and a letter explaining that the Debtor was not eligible for the Home Affordable Modification Program (HAMP).

On April 3, 2014, the Trust commenced a foreclosure action in Saratoga County Supreme Court. (Debtor's Ex. 10.) Following the commencement of the action, a series of settlement conferences were held pursuant to N.Y. C.P.L.R. 3408. According to the Trust, the conferences were held on August 28, 2014, December 4, 2014, February 27, 2015, and June 18, 2015.[1] In addition to receiving written communications directly from the Trust, the Debtor attaches copies of documents received in the context of the foreclosure action, including correspondence regarding the C.P.L.R. 3408 settlement conferences (Debtor's Ex. 7, 9), four letters regarding mortgage reinstatement sent from state court foreclosure counsel (Debtor's Ex. 8), the foreclosure summons and complaint (Debtor's Ex. 15), and the Trust's motion for summary judgment (Debtor's Ex. 10). It is the Court's understanding that the foreclosure action is still being litigated in state court.

## ARGUMENTS

---

[1] The Debtor does not dispute these dates.

3

The Debtor argues that the Trust repeatedly violated the discharge injunction by attempting to collect a discharged debt from him personally. Specifically, the Debtor contends that the Trust violated the discharge injunction by (1) conducting dozens of harassing property visits and inspections and (2) sending various written communications to him, including monthly statements, an Escrow Notice, and forced-placed insurance notices.  Within the context of the foreclosure action, the Debtor maintains that the Trust violated the discharge injunction by (1) seeking more than *in rem* relief in the foreclosure action and (2) forcing him to attend the C.P.L.R. 3408 foreclosure conferences and submit a HAMP application.

Further, the Debtor claims that the above referenced violations were willful and, therefore, are punishable by contempt.  The Debtor seeks actual damages for emotional distress and, as part of an award of punitive damages, asks this Court to enter an order either dismissing the foreclosure complaint or, in the alternative, enjoining the Trust from continuing its foreclosure action.

The Trust argues that any and all post-discharge actions that it may have taken, in and out of state court, were either for informational purposes or to enforce its rights against the Property and not against the Debtor personally.  Alternatively, the Trust urges that its actions are permitted under the safe harbor provision in 11 U.S.C. § 524(j).  Finally, the Trust contends that even if the Court were to hold that the Trust violated the discharge injunction, any such violation was not willful and, therefore, cannot support a monetary award to the Debtor.

On reply, the Debtor raises arguments that were not included in the Amended Motion, including, but not limited to, arguing that the Trust never had a valid security interest in the property because of an alleged forgery involving the promissory note.   Additionally, the Debtor argues that the discharge eliminated any obligation to maintain property insurance, and, therefore, all of the forced-placed insurance communications violate the discharge injunction.

4

## DISCUSSION

### The Discharge Injunction

"A discharge in bankruptcy operates as an injunction against collection of any discharged debts." *Kuhl v. United States*, 467 F.3d 145, 147 (2d Cir. 2006). "The purpose of the permanent injunction is to effectuate one of the primary purposes of the Bankruptcy Code: to afford the debtor a financial fresh start and to insure that, once a debt is discharged, the debtor will not be pressured in any way to repay it." *Watkins v. Guardian Loan Co. of Massapequa, Inc. (In re Watkins)*, 240 B.R. 668, 675 (Bankr. E.D.N.Y. 1999) (citing *In re Borowski*, 216 B.R. 922, 924 (Bankr. E.D. Mich. 1998)). The standard for determining whether an act violates the discharge injunction is an objective one; "the debtor's subjective feeling of coercion or harassment is not enough." *Bates v. CitiMortgage, Inc.*, 844 F.3d 300, 303 (1st Cir. 2016) (citing *Lumb v. Cimenian (In re Lumb)*, 401 B.R. 1, 6 (1st Cir. B.A.P. 2009)). While "[s]ection 524 does not include an explicit enforcement mechanism," courts within this circuit have consistently relied on section 105 to hold that violations of the discharge injunction are punishable by contempt. *In re Nassoko*, 405 B.R. 515, 520 (Bankr. S.D.N.Y. 2009) (citing *In re Thompson*, 2007 Bankr. Lexis 2830, at *6 (Bankr. N.D.N.Y. Aug. 21, 2007).

For the Debtor to be awarded monetary relief for contempt of the discharge injunction, he must establish by clear and convincing evidence that the Trust willfully violated the discharge injunction. *See Elliott v. PHH Mortgage Corp.*, 7:15-CV-10221 (BKS) at 7-8 (N.D.N.Y. March 3, 2017); *Thompson*, 2007 Bankr. Lexis 2830, at *6. To meet this burden, the Debtor must establish that the Trust had notice of the Debtor's discharge and "intentionally took action which violated the injunction." *Id.* at *6. If the Debtor does not establish the violations, if any, were

5

willful, monetary damages will not be awarded. *See Nicholas v. Oren (In re Nicholas)*, 457 B.R. 202, 226 (Bankr. E.D.N.Y. 2011); *In re Dabrowski*, 257 B.R. 394, 404 (Bankr. S.D.N.Y. 2001).

## I.    PROPERTY VISITS AND INSPECTIONS

Pursuant to Federal Rule of Bankruptcy Procedure 9013, the grounds for a motion must be set forth with particularity. The moving party "'must allege facts indicating that some kind of cause exists' for the motion." *Elliot*, 15-CV-01221, at 8 (quoting *In re White*, 409 B.R. 491, 493 (Bankr. N.D. Ind. 2009)). Where the Debtor fails to include factual details for an alleged discharge injunction violation, the motion may be denied because the allegations are bare legal conclusions. *Id.* at 9.

In *Elliot*, the District Court reviewed a Bankruptcy Court's decision that denied sanctions for a creditor's alleged violation of the discharge injunction. *Id.* at 6. The debtors alleged that the creditor violated the discharge injunction by calling them regularly. *Id.* at 5. However, as the District Court noted, the debtors' motion contained "no details with respect to the phone calls, stating only that [the debtors] received calls from KeyBank . . . ." *Id.* at 9. The Bankruptcy Court held that the debtors failed to sufficiently allege supporting facts to meet Rule 9013's pleading requirements. *See id.* On appeal, the District Court found that the specificity requirements of Rule 9013 are of particular importance when analyzing the fact intensive question of whether a creditor has violated the discharge injunction. *See id.* at 7–9. For this reason, the District Court affirmed the Bankruptcy Court's decision, concluding that "[t]he bankruptcy court correctly ruled that . . . absent any relevant facts about the phone calls, the motion was insufficiently particular." *Id.* at 11.

Similarly, in the matter at hand, the Debtor alleges that there were "'71' separate visits on a bi-weekly basis to leave notes without bankruptcy disclosure on [his] doors advising [him] to

6

contact [his] mortgage company," and "'26' monthly invasive property inspections." (Debtor's Am. M. ¶ 11). However, the Debtor does not otherwise specify the factual circumstances of any of these visits or inspections, such as the dates, times, identities of the individuals involved or the basis for the claim that the notes violate the discharge injunction. Nor does the Debtor attach, as he did with dozens of other written communications, any of the seventy-one notes that were allegedly left at his residence. For these reasons, the Debtor has failed to demonstrate that the Trust violated the discharge injunction by way of either property visits or inspections.

## II. WRITTEN COMMUNICATIONS

"The discharge injunction does not prohibit every communication between a creditor and debtor – 'only those designed to collect, recover or offset any such debt as a personal liability of the debtor.'" *In re Gill*, 529 B.R. 31, 37 (Bankr. W.D.N.Y. 2015) (quoting *In re Whitaker*, 2013 Bankr. LEXIS 2328, at *25 (Bankr. E.D. Tenn. June 7, 2013)) (internal quotation marks omitted). "Determining whether communications with a debtor violate the discharge injunction is a 'particularly fact-intensive inquiry. . . .'" *Henriquez v. Green Tree Servicing, LLC (In re Henriquez)*, 536 B.R. 341, 345 (Bankr. N.D.Ga. 2015) (quoting *Gill*, 529 B.R. at 37). "While disclaimer language in a communication to a debtor who has received a discharge is always advisable, its absence does not automatically render the communication a per se violation of the discharge injunction." *In re Whitaker*, 2013 Bankr. LEXIS 2328, at *25.

### A. Monthly Statements

The Debtor attaches forty monthly statements to the Amended Motion and alleges that each of the statements constitutes a willful attempt to collect a debt in violation of the discharge injunction. When analyzing whether a monthly statement amounts to a violation of the discharge injunction, the primary consideration is whether a monthly statement contains "a clear demand for

7

payment of a prepetition debt accompanied by coercion in the form of threatened action or some other consequence for nonpayment, or harassment to induce the Debtor to pay." *Elliot*, at *10. More specifically, courts have focused on whether the statement refers to an amount as "due" and the nature and extent of any bankruptcy disclaimer or notice included in the statement. *See Gill*, 529 B.R. at 38; *Lemieux v. America's Servicing Co. and Wells Fargo Home Mortg. (In re Lemieux)*, 520 B.R. 361, 365-67 (Bankr. C.D. Mass. 2014); *Henriquez*, 536 B.R. at 345-47.

The form and content of the monthly statements in the record change over time. However, all of the statements contain a financial summary and a detachable payment coupon. None of the financial summaries state that any amount is due and none of the payment coupons state that a payment must be made. Moreover, every statement has several relevant disclaimers. The 2011 statement and the 2012 statements contain three relevant disclaimers. First, a notice, printed at the top of the statement in bold font and underlined, indicates that the notice is "**For informational purposes**" ("Disclaimer One"). A second disclaimer placed farther down the page reads:

> **Important messages**
> This statement is for informational purposes only. Our records indicate that your loan is subject to bankruptcy. The attached coupon reflects the calendar due date, not the contractual due date of the bankruptcy case. If you have any questions regarding your loan, please contact your bankruptcy attorney or our office. ("Disclaimer Two")

Finally, a third disclaimer in the body of the statement states:
> This statement is for informational purposes only and is being provided as a courtesy should you voluntarily decide to make your loan payments. This statement should not be construed as an attempt to collect a debt or a demand for payment contrary to any protections you may have received pursuant to your bankruptcy case.
> If you have received a discharge, and the loan was not reaffirmed in the bankruptcy case, we will only exercise our rights as against the property and we are not attempting any act to collect the discharged debt from you personally. ("Disclaimer Three")

8

The relevant disclaimers, although substantially similar, were modified or moved in the 2014 statements.[2] Specifically, the notice at the top of the first page was changed to read:

> PLEASE NOTE: If you are presently seeking relief (or have previously been granted relief) under the United States Bankruptcy Code, this statement is being sent to you for informational purposes only.

Further, a disclaimer was added to the payment coupon that states:

> If you are currently a party in a bankruptcy case and you choose to make a voluntary payment, detach and return the remittance coupon with your payment. ("Disclaimer Four")

Finally, at the end of the statements, on the second page, there is the following notice:
> Important bankruptcy notice
> If you are presently seeking relief (or have previously been granted relief) under the United States Bankruptcy Code, this statement is being sent to you for informational purposes only. It is provided to you as a courtesy should you voluntarily decide to make payments on your account. Notwithstanding any language contained in this statement, we want to assure you that we:
> - Are not providing this information to you in an attempt to collect a debt from you or in any way violate any provision of the United States Bankruptcy Code;
> - Will not seek collection of any amount owing on your account that will be (or has been) discharged in connection with your bankruptcy case, except any amount that may be payable to us as a result of filing a proof of claim in your bankruptcy case; and
> - Will only file a proof of claim for any amount owing on your account in your bankruptcy case if and when it is appropriate to do so.
> In addition, if you filed a Chapter 7 bankruptcy case and received a discharge, but you did not reaffirm this debt, then please be advised that we are not sending this statement to you in an attempt to collect this debt from you personally and we can only exercise our rights against the property securing this debt. ("Disclaimer Five")

The statements for 2015 and 2016 contain the same notice which appeared at the top of the 2014 statements, as well as Disclaimers Four and Five.

---

[2] No monthly statements were attached for the year 2013. For the statements from January 2014 to the July 2014, Disclaimer Two appears as in all prior statements.

The Debtor has failed to establish that any of the aforementioned statements were sent to him in an attempt to collect a discharged debt. Much like in *In re Gill* and *Henriquez*, extensive disclaimers make clear that the statements were sent only for informational purposes. *See Gill*, 529 B.R. at 38; *Henriquez*, 536 B.R. at 345-47. Each statement contains multiple references to bankruptcy and some of the statements include disclaimers exceeding 300 words. *See Lemieux*, 520 B.R. at 366 (holding no violation of discharge injunction where creditor contained disclaimers of approximately 100 words). The payment coupons at the bottom of the statements include disclaimers emphasizing that any payment to be made is voluntary. While the statements include financial summaries regarding monthly payment amounts, late charges, and unpaid balances, none of the statements contain the word "due," or any other language that could be construed as a demand for payment. *See Lemieux*, 520 B.R. at 365; *Elliott*, 7:15-CV-01221 at 9. Therefore, the Court finds that these monthly statements do not violate 11 U.S.C. § 524(a)(2).

### B. Escrow Account Notice

The Debtor alleges that, by sending the escrow account notice to him, the Trust was attempting to collect the escrow shortage from him personally. (Debtor's Ex. 3.) However, as with the monthly statements, the notice does not demand payment from the Debtor individually or state that any amount is due, but rather informs the Debtor of dollar amounts being added to the value of the Trust's lien. Furthermore, the notice includes a disclaimer near the top of each page which reads, "For informational purposes." An additional disclaimer appears in the body of the first page, stating:

> Note: This notice is for informational purposes only and is being provided as a courtesy should you voluntarily decide to make any escrow shortage payment, if applicable. This notice should not be construed as an attempt to collect a debt or a demand for payment contrary to any protection you may have received pursuant to your bankruptcy case.

For these reasons, the Court concludes that the Trust did not violate the discharge injunction by sending the Escrow Notice.

### C. Forced-Placed Insurance Notices

It is the Debtor's position that the Trust violated the discharge injunction by attempting to collect the cost of the forced-placed insurance from him personally. While "the Code provides a discharge of personal liability for debt, it does not discharge the ongoing burdens of owning property." *Canning v. Beneficial Maine, Inc. (In re Canning)*, 442 B.R. 165 (Bankr. D. Me. 2011), *aff'd* 706 F.3d 64 (1st Cir. 2013); *see also Thomas v. Seterus Inc. (In re Thomas)*, 554 B.R. 512, 521 (Bankr. M.D. Al. 2016) (holding that the contractual obligation to maintain hazard insurance "continued to run with the property" because the obligation was both *in personam* and *in rem*); *Henriquez,* 536 B.R. at 347; *Arsenault v. JP Morgan Chase Bank, N.A. (In re Arsenault)*, 456 B.R. 627, 631 (Bankr. S.D. Ga. 2011). For this reason, a mortgagee may enforce the obligation to maintain hazard insurance "to the extent that it can be done through the [p]roperty." *Thomas*, 554 B.R. at 521. Therefore, "[w]hen a mortgagee is forced to buy insurance to protect its collateral, the . . . discharge injunction do[es] not prohibit it from charging the cost of the insurance against the debtor's equity in the property." *Id.* at 523. As with other written communications, when determining whether an insurance notice violates the discharge injunction, courts look to whether an insurance notice contains a bankruptcy disclaimer. *Id.*

Additionally, courts have noted that lien holders are required to send certain forced-place insurance notices under the Real Estate Settlement Procedures Act. "Pursuant to 12 U.S.C. 2605(1), 'a servicer may not impose any charge on any borrower for forced-placed insurance with respect to any property securing a federally related mortgage' unless the servicer sends at least two written notices informing the borrower that it must obtain hazard insurance and if it does not the

11

servicer may obtain it at the borrower's expense[]." *Henriquez*, 536 B.R. at 348; *Elliot,* 7:15-CV-01221 at 9.

Here, the Debtor received a total of seven insurance communications involving four different forced-placed insurance policies.[3] (Debtor's Ex. 4 – 6.) The insurance communications can be placed in three categories: (1) notices advising that hazard insurance coverage was expiring and that insurance effective the date of termination of the expiring policy would be purchased if the Debtor did not purchase insurance, (2) insurance packets advising that the Trust has purchased hazard insurance for the Property, and (3) communications regarding the policies that were in place.

There are two notices in the first category, dated September 1, 2015 and September 1, 2016. (Debtor's Ex. 4.)  Both state that the current forced-placed insurance policy was expiring on October 31st of each respective year and that the Trust intended to purchase insurance on the Property if the Debtor did not.  Each notice also provides an estimated premium for the hazard insurance that the Trust would purchase and includes a hazard insurance informational page that recommends, among other things, that the Debtor purchase his own coverage because in "nearly all instances, the hazard insurance coverage [the Trust] obtained may be significantly more expensive than a policy [he] could obtain from an insurance provider of [his] choice." Both notices contain disclaimers that address debtors who have received discharges and did not reaffirm the underlying debts.

Each of the insurance packets, dated November 16, 2013, November 10, 2014, and November 9, 2016, contain a notice informing the Debtor that hazard insurance was purchased because he did not purchase insurance by the expiration date of the prior policy and states the

---

[3] The forced-placed insurance policies at issue were for the following coverage dates: 10/31/2013-10/31/2014; 10/31/2014-10/31/2015; 10/31/2015-10/31/2016; 10/31/2016-10/31/2017.

12

effective date of the new policy. Additionally, each packet contains an insurance declaration providing information about the policy, including the amount of the premium. Each of the notices in the packets contain bankruptcy disclaimers. The packets from 2013 and 2014 also contain an additional informational page offering to help the Debtor acquire his own hazard insurance.

The communications dated June 2, 2015 and April 29, 2016 fall into the third category. The June 2015 communication appears to be an endorsement amending the mailing and property address on the policy effective from October 31, 2014 to October 31, 2015. (Debtor's Ex. 5.) The April 29, 2016 communication is a notice reminding the Debtor that while the Trust has a forced-placed insurance policy on the property, the Debtor may purchase his own hazard insurance. (Debtor's Ex. 4.)

Just as in *Henriquez*, none of the insurance communications here contain a clear demand for payment of the insurance premiums. *See also Elliott* 15-CV-01221 at 9. Instead, each communication serves a specific purpose not related to seeking payment. First, the notices informed the Debtor that the Trust would purchase insurance if he did not do so by the time the current insurance policy expired.[4] Second, the notices gave the Debtor details about the policies that the Trust purchased for his residence and advised how the Debtor could purchase his own, potentially less expensive, policy. Third, the June 2015 endorsement informs the Debtor of a mailing and property address change on the policy. Fourth, the April 2016 notice reminds the Debtor that he may seek to purchase his own insurance for the property. All of the insurance communications before the Court were aimed at keeping the Debtor informed about different aspects of the hazard insurance the Trust maintained on the property and were not for the purpose of collecting the cost of the insurance premium.

---

[4] It appears that these notices may have been those required to be sent pursuant to 12 U.S.C. 2605(l) prior to purchasing forced-placed insurance.

13

To the extent that the insurance communications contain any language that could be interpreted as demanding payment, relevant bankruptcy disclaimers within those communications remove any such doubt. Particularly, the November 9, 2016 notice provides, "The annual premium is shown on the policy/certificate and will be charged to your account. You will be responsible for the repayment of this premium." (Debtor's Ex. 4.) While there might have otherwise been a question as to whether this could be construed as an attempt to assert personal liability against the Debtor, the following disclaimer on the same page makes clear that is not the case:

> This notice is for informational purposes only
>
> PLEASE NOTE: This notice is being provided for informational purposes only. As a result of at least one bankruptcy filing that included the above referenced account, Wells Fargo is NOT attempting in any way to violate any provision of the United States Bankruptcy Code or to collect a debt deficiency or otherwise) from any customer(s) who is impacted by an active bankruptcy case or has received a discharge, where the account was not otherwise reaffirmed or excepted from discharge. THIS IS NOT A BILL OR A REQUEST FOR PAYMENT AS TO THESE CUSTOMER(S).[5]

The court in *Henriquez* analyzed two insurance communications that were similar to the November 9, 2016 notice. *Henriquez*, 536 B.R. at 347. In that case, the first notice stated, "[y]ou must pay us for any period during which the insurance we buy is in effect but you do not have insurance." *Id.* (internal quotations omitted). The second notice provides, "[y]ou are responsible for the cost of the insurance we have purchased and any finance charges that are assessed." *Id.* (internal quotations omitted). Despite this language, the court held that the notices did not violate the injunction because both notices contained large, conspicuous disclaimers which read, in part:

> **IF YOUR ACCOUNT WAS DISCHARGED IN BANKRUPTCY WITHOUT A REAFFIRMATION, THE CREDITOR IS NOT ATTEMPTING TO COLLECT OR**

---

[5] This disclaimer was also contained within the communications dated April 29, 2016 and November 9, 2016.

14

**RECOVER THE DISCHARGED DEBT AS YOUR PERSONAL LIABILITY.**

*Id.* at 347–48.

The notices dated September 1, 2015 and November 10, 2014 each contain, near the bottom of the last page, a disclaimer which states, "if you have received a discharge from bankruptcy, and the account was not reaffirmed in the bankruptcy case, Wells Fargo Bank, N.A. will only exercise its rights against the property and is not attempting to collect the discharged debt from you personally."[6] (Debtor's Ex. 4, 6.) These disclaimers, although not as extensive, are worded nearly identically to those which courts have held are sufficient to defeat allegations of discharge injunction violations when contained within similar insurance communications. *See Elliot*, 15-CV-01221, at 4, 12. For these reasons, the insurance communications did not violate the discharge injunction.

   III.   ALLEGED DISCHARGE INJUNCTION VIOLATIONS RELATED TO FORECLOSURE ACTION

A "bankruptcy discharge extinguishes only 'the personal liability of the Debtor.'" *Gill*, 529 B.R. at 37 (quoting *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991)). Therefore, a "mortgage foreclosure action generally will not violate the injunction because a mortgage, as distinguished from a note agreeing to repay a loan, is not 'a personal liability of the Debtor.'" *Rinaldi v. Green Tree Servicing LLC*, 2015 U.S. Dist. LEXIS 127564, at *9 (S.D.N.Y. June 8, 2015); *see also Knox v. Countrywide Bank*, 2015 U.S. Dist. LEXIS 120052 at *23 (E.D.N.Y. July 29, 2015), *aff'd* 673 Fed. Appx. 31 (2d Cir. 2016); *In re Wilson*, 492 B.R. 691, 696 (Bankr. S.D.N.Y. 2013). A foreclosure action does not violate the discharge injunction as long as a deficiency judgment is not

---

[6] The disclaimer in *Elliot* read, in relevant part, "if you have received a discharge from bankruptcy, and the loan was not reaffirmed in the bankruptcy case, [the lender] will only exercise its rights against the property and is not attempting any act to collect the discharged debt from you personally." *Elliot*, 15-CV-01221, at 4.

sought against the Debtor. *See Drew v. Chase Manhattan Bank*, 185 B.R. 139, 142 (S.D.N.Y. 1995) (holding that "while the personal obligation is discharged in bankruptcy, a valid mortgage lien survives the bankruptcy").

Here, the Debtor alleges that the Trust has violated the discharge injunction by seeking more than *in rem* relief in its foreclosure action. The Debtor's position is not supported by any evidence in the record. The foreclosure summons specifically states, "The Plaintiff makes no personal claim against you in this action." (Debtor's Ex. 15). The summons goes on to state:

> If you have obtained an order of discharge from the Bankruptcy court, which includes this debt, and you have not reaffirmed your liability for this debt, this law firm is not alleging that you have any personal liability for this debt and does not seek a money judgment against you. Even if a discharge has been obtained, this lawsuit to foreclose the mortgage will continue and we will seek a judgment authorizing the sale of the mortgaged premises.

Similarly, the complaint does not seek a deficiency judgment against the Debtor. The Motion for Summary Judgment (Debtor's Ex. 10) also contains no indicia of any attempt to hold the Debtor personally liable. Oddly, it appears that Debtor also argues that the Trust violated the discharge injunction by filing pleadings that do not adequately specify that he received a Chapter 7 discharge. However, this argument is misplaced as the Code does not require the Trust to plead with particularity any details of the Debtor's bankruptcy history. The relevant consideration is the relief actually demanded within the foreclosure action. In this case, the above referenced pleadings clearly establish that the Trust is seeking to foreclose on its lien and nothing more.

Within the context of the foreclosure settlement conferences, the Debtor argues that the Trust violated the discharge injunction by forcing him to attend C.P.L.R. 3408 settlement conferences against his will, sending him two payoff and two reinstatement letters, and forcing him to submit a HAMP application. Pursuant to C.P.L.R. 3408, "the Court shall hold a mandatory

16

conference . . . for the purpose of holding settlement discussions . . . ." C.P.L.R. 3408(e)(1) requires that the foreclosing plaintiff bring a variety of documents to the settlement conferences, including "an itemization of the amounts needed to cure and pay off the loan." In the present case, four settlement conferences were held. As evidence that he was compelled to attend, the Debtor attaches and relies on the "Rugino Letter." (Debtor's Ex. 7.) Instead of bolstering the Debtor's allegations, the letter supports the Trust's position as it shows that the Debtor was not willing to waive his right to the conferences. It appears that the Debtor, by requesting to hold the conferences in abeyance, wanted to preserve his ability to attend settlement conferences until an issue he had raised regarding standing was resolved. Based on the record, there is no evidence that the Trust compelled the Debtor to continue appearing at the foreclosure conferences.

In any event, even if the Debtor was somehow coerced into participating in the conferences, for the Court to find that this coercion amounted to a discharge injunction violation, the Debtor would have to prove that the Trust sought to collect the discharged debt from him personally through the settlement conferences. Absent from any of the Debtor's pleadings before this Court is any allegation, let alone proof, that the Trust used the settlement conference process to do more than attempt to reach a settlement as to the Trust's lien interest. Without such allegation, the Debtor's argument regarding the settlement conferences is without merit.

With regard to the payoff and reinstatement letters the Trust sent to the Debtor, such communications were sent as required by C.P.L.R. 3408(e) and, more importantly, as demanded by the Debtor. As the Trust explains, the Debtor made a motion seeking to have the state court sanction the Trust for, among other reasons, failing to provide payoff and reinstatement letters. (Schiavo Decl. Ex. E.) For this reason, the Trust claims that, should this Court hold that the payoff

and reinstatement letters violated the discharge injunction, it would be ensnared in a "Catch 22." The Court agrees.

A review of the Debtor's motion for sanctions reveals that the Debtor specifically complained of the Trust's failure to provide accurate payoffs and reinstatement letters. (Schiavo Decl. Ex. E.) The Debtor insisted that, for the settlement conferences to be meaningful, he needed to be provided with payoffs and reinstatement letters. Despite the language in the payoff and reinstatement letters that could otherwise lead the Court to conclude that each was an attempt to collect a discharged debt, the circumstances surrounding these communications make clear that the Trust was not attempting to collect a debt, but was merely trying to comply with C.P.L.R. 3408(e) and avoid being sanctioned.[7] Based on the Sanctions Motion, it is hard to understand how the Debtor can argue the payoff and reinstatements letters violate the discharge injunction.

The Debtor's efforts to capitalize on the "Catch 22" extend to his allegations that he was forced to fill out a HAMP application as part of the settlement conferences. His motion for sanctions in the state court cements that the Debtor wanted to have it both ways. On one hand, he argued that the HAMP process was forced upon him because the standing issue had not yet been adjudicated. On the other hand, he stated that he was improperly denied the HAMP modification and sought sanctions against the Trust for allegedly failing to accurately represent his income. His continued pursuit of the HAMP modification contradicts his claims here. Further, the record does not support a finding that the Trust compelled the Debtor to participate in the HAMP process.

Moreover, the Debtor has failed to articulate why his participation in the HAMP process should be considered an act to collect a discharged debt. A modification would have potentially

---

[7] It is important to note that the payoffs and reinstatements were dated September 2, 2014 (two), March 12, 2015, and March 13, 2015. The letters in September were sent within five days of the August 28, 2014 C.P.L.R. 3408 conference, and the letters in March 2015 were sent within two weeks of the February 27, 2015 settlement conference and approximately a week after the Debtor moved for sanctions.

18

allowed him to remain in his home without having to continue defending the foreclosure action. For all of these reasons, the Trust's actions related to the foreclosure proceeding did not violate the discharge injunction.

### IV.     11 U.S.C. § 524(J) – SAFE HARBOR

The Court does not need to address the applicability of the safe harbor provision because it does not find the Trust violated the discharge injunction.

### CONCLUSION

Based upon the foregoing, the Debtor's Amended Motion for Contempt of the Discharge Injunction is denied in its entirety.

It is SO ORDERED.

Dated: August 14, 2017                                   /s/ Robert E. Littlefield, Jr.
       Albany, New York                                  Robert E. Littlefield, Jr.
                                                                                         United States Bankruptcy Judge